## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

———————————————————

MEGAN DUVAL,                                    )
                                                )
                        Plaintiff,              )
            v.                                  )
                                                )
PHYSICIANS MEDICAL CENTER, LLC,                 )
SURGERY PARTNERS, INC.,                         )
SP MANAGEMENT SERVICES, INC.,                   )   Docket No. 2:22-cv-2286
SP LOUISIANA, LLC,                              )
ANDREW KNIZELY,                                 )
JEANNE OLIVIER,                                 )
BRITTNEY SONNIER,                               )
TARA PELLEGRIN,                                 )
SCOTT CHAPMAN,                                  )
SANDRA VINCENT, and                             )
XYZ INSURANCE COMPANIES 1-10,                   )
                                                )
                        Defendants.             )
———————————————————————)

## COMPLAINT

1.      Plaintiff Megan Duval was the Chief Nursing Officer at the Physicians Medical Center of Houma, a hospital specializing in surgical implants.

2.      In 2019, Ms. Duval discovered billing discrepancies at the hospital. The hospital was in some cases overcharging Medicare for procedures, and in other cases billing Medicare for medications that were never administered.

3.      Ms. Duval reported this to her superiors. It resulted in broad changes to the hospital's billing practices, and a shareholder lawsuit against the owners of the hospital.

4.      In 2020, the hospital hired a new CEO, Andrew Knizely.

5.      When Knizely learned that Ms. Duval had been a whistleblower, he began a campaign of harassment in an effort to force her out based on her gender and whistleblower activities.

6.      He began telling employees that Ms. Duval had "slept her way to the top" and that she was using sexual relations with doctors as "blackmail." He falsely said Ms. Duval had made sexual advances on him.

7.      He described Ms. Duval as "histrionic" and a "siren," and told Ms. Duval's subordinates not to follow her directions because "any authority she has is fake." He told employees that he purposefully ignored Ms. Duval's emails because he liked to "fuck with" her.

8.      And then when Ms. Duval was on FMLA leave due to two bouts of COVID-19, Defendants replaced her, removed her from her position as Chief Nursing Officer, and offered her a demoted replacement position. The hospital also refused to accommodate – or even respond to – her requests for accommodation as she recovered from long COVID symptoms.

9.      When Ms. Duval brought all of this to Defendants' attention, they conducted an "internal investigation."

10.     Among the evidence the internal investigation received was an employee affidavit that swore that:

> **"Andrew and Surgery Partners are trying to get rid of Megan Duval at any cost due to her discovery of billing issues that led to the lawsuit filed by the doctors**."

(Emphasis added.)

11.     This was corroborated by an audio recording in which one of Defendants' employees is heard to say:

> **"I am complicit, we are complicit in this, like, planned, like, conspiracy to fuck with her, to push her over the edge so that she quits."**

12.     But although employees confessed, under oath and in audio recordings, the treatment of Ms. Duval, Defendants' investigation resulted in no terminations or discipline whatsoever – except a reprimand against *Ms. Duval herself* because she "behaved inappropriately."

13.     Defendants' actions are illegal. They constitute violations of the False Claims Act, Title VII, the Equal Pay Act, the Americans with Disability Act, the Rehabilitation Act, the Louisiana Employment Discrimination Law, the Louisiana Human Rights Act, the Family Medical Leave Act, and other laws.

14.     Because Defendants refused to take any measures for accountability, Ms. Duval now brings this lawsuit.

## I.     JURISDICTION AND VENUE

15.     Plaintiff brings this action pursuant to Title VII of the Civil Rights Act, the False Claims Act, the ADA and Rehabilitation Act, and other federal and state statutes. Jurisdiction is based on 28 U.S.C. § 1331 (federal question). Plaintiff further invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367 to hear claims arising under state law.

16.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391 as a substantial part of the events giving rise to Plaintiffs' claims arose in the Eastern District of Louisiana, and because Defendants reside and do business in the District.

## II.  PARTIES

*Plaintiff*

17.     Plaintiff Megan Duval is an adult citizen of the State of Louisiana and domiciled in the Eastern District of Louisiana.

*Defendants*

18.     <u>Defendant Physicians Medical Center, L.L.C.</u> ("PMC") is a Louisiana Limited

Liability Company, Charter No. 34471393K. It is formerly known as Physicians Surgical Specialty

Hospital, LLC, and the Surgical Limited Liability Company. Defendant is managed by Jennifer

Baldock and Tom Cowhey. Defendant is domiciled in Houma, Louisiana and operates the hospital

Ms. Duval worked at in Houma, Louisiana ("PMC of Houma"). PMC identifies itself as "A

Surgery Partners Company" and is owned by Surgery Partners, Inc. (50% ownership) and

individual physicians who provide medical services at PMC of Houma (collectively 49%). The

Board of PMC is comprised of three Surgery Partners, Inc. employees, and three physician

representatives. During the relevant times in this suit, Scott Chapman, Surgery Partners, Inc. and

two other SP employees filled three of the six spots on the PMC Board. PMC pays a monthly

management fee to SP Management Services, Inc. to provide hospital, patient, certification,

evaluation, and staff management services to PMC. PMC employees, including the highest levels

of leadership, were supervised by Surgery Partners Inc. employees, including the head of Human

Resources, CEO, CFO, and Chief Nursing Officer. PMC's benefits policies list PMC as Ms.

Duval's employer, says that PMC provides and pays for her benefits, and tells her to go to PMC

Human Resources with benefits questions.

19.     At all times described in this Complaint, PMC had over 100 employees all working

at PMC of Houma.

20.     <u>Defendant Surgery Partners, Inc</u>. is a corporation incorporated in Delaware, based in Tennessee, and operating in part in Louisiana. It is an operator of surgical facilities and ancillary services with more than 180 locations nationwide, including operations at the hospital operated by Physicians Medical Center, LLC in Houma, Louisiana where they manage Louisiana employees and provide services for Louisiana patients. Its Louisiana charter number is 42033553F. Defendant is managed by Jennifer Baldock, Tom Cowhey, Brett Kennedy, Dave Doherty, and Jeff O'Brien. Surgery Partners Inc. provides all employees, funds and resources to PMC to fulfill the management services that SP Management Services, Inc. is paid to perform. Surgery Partners, Inc. provides PMC with human resources services, a shared payment processing system for staff wages, email management for staff (including use of an @surgerypartners.com address), benefits and time off, supervision and oversight of PMC employees (including the President, Chief Nursing Officer, Human Resources, and other leadership), recruits new hires, manages the PMC website and provides content and photography to match the Surgery Partners, Inc. website, reviews determinations regarding compensation, requests for promotion, assignment of job duties, leave requests, among other personnel decisions.

21.     <u>Defendant SP Management Services, Inc</u>. is a Tennessee corporation authorized to do and doing business in Louisiana, including operations at the hospital operated by Physicians Medical Center, LLC in Houma, Louisiana where they manage Louisiana employees and provide services for Louisiana patients. Their registered office and principal business establishment in Louisiana at 501 Louisiana Avenue, Baton Rouge, LA 70802. Defendant is managed by Jennifer Baldock, Tom Cowhey, Brett Kennedy, Dave Doherty, and Jeff O'Brien. SP Management receives hundreds of thousands of dollars from PMC each month to provide management services to PMC and provides these funds to Surgery Partners, Inc.  Ms. Duval's paystubs show her benefits come

from SP Management Services, Inc. Upon information and belief, SP Management Services Inc is owned by Surgery Partners, Inc.

22.     Defendant SP Louisiana, LLC, is a Louisiana company domiciled at 501 Louisiana Avenue, Baton Rouge, LA 70802. SP has annual revenues in excess of a billion dollars. Defendant is managed by Jennifer Baldock and Tom Cowhey. Upon information and belief, SP Louisiana LLC is owned by Surgery Partners, Inc.

23.     Together, Surgery Partners, Inc., SP Management Services, Inc., and SP Louisiana, LLC, are referred to as "SP."

24.     At all times described in this Complaint, SP had over 20 employees.

25.     Together SP and PMC are the "Corporate Defendants."

26.     The Corporate Defendants were jointly Ms. Duval's employer.

27.     Together, the Corporate Defendants run the Physicians Medical Center of Houma ("PMC of Houma"), an acute care hospital offering a full range of surgical and ancillary services.

28.     Defendant Andrew Knizely is a person of the full age of majority maintaining a residence in the Baton Rouge, Louisiana.  He is PMC's Interim Chief Executive Officer, Ms. Duval's supervisor, and the CEO of PMC of Houma and worked onsite 50% of the time.  Upon information and belief, he exercised operational control over significant aspects of some of the corporate Defendants' day-to-day functions.

29.     Defendant Jeanne Olivier is a person of the full age of majority maintaining a residence in the Eastern District of Louisiana and is an employee of PMC who works at PMC of Houma.

30.     <u>Defendant Brittney Sonnier</u> is a person of the full age of majority maintaining a residence in the Eastern District of Louisiana and is an employee of PMC who works at PMC of Houma.

31.     <u>Defendant Tara Pellegrin</u> is a person of the full age of majority maintaining a residence in the Eastern District of Louisiana and is an employee of PMC who works at PMC of Houma.

32.     <u>Defendant Scott Chapman</u>  is a person of the full age of majority and an employee of Surgery Partners, Inc.

33.     <u>Defendant Sandra Vincent</u> is a person of the full age of majority and an employee of Surgery Partners, Inc.

34.     <u>Defendants XYZ Insurance Cos. 1-10</u> are unknown insurance companies that insure one or more Defendants for the claims described herein.

35.     Except as otherwise indicated, each defendant is a joint tortfeasor with every other defendant under Louisiana Civil Code Art. 2324.

### III.     STATEMENT OF FACTS

**A.     In her role as Chief Nursing Officer, Ms. Duval discovered that PMC of Houma was overbilling Medicare.**

36.     Megan Duval was hired by PMC and began working at PMC of Houma in 2012.

37.     Ms. Duval was paid by SP Management Inc, but received benefits from PMC.

38.     Although pay and benefits came from PMC, Ms. Duval's employment was managed by SP. For example, she utilized an @surgerypartners.com email, and entered all leave requests into a system called Ultipro which is access through and SP website link "http://www.spconnect.surgerypartners.com" that was also used by SP to manage other hospitals nationwide. The Ultipro site was also used by Ms. Duval to track her compensation and benefits.

39.     She worked first as a Perioperative RN and then as Director of the Preop, PACU, and Preadmission Departments.

40.     In December 2015, she was promoted to be Assistant Chief Nursing Officer.

41.     Her performance at PMC of Houma was exemplary; she received consistently exceptional evaluations.

42.     Prior to the retaliation described below, she never had a write-up or reprimand of any kind.

43.     Beginning in 2018, as part of Surgery Partner's Implant initiative, Ms. Duval reviewed spine/orthopedic implant billing data used by private insurance companies as well as to the federal and state government for Medicare and Medicaid.

44.     She began to identify coding discrepancies and missing implant codes.

45.     She reported these issues to James Murphy, a Surgery Partners employee, Chad Baldwin, a Surgery Partners employee, and Paula Poore, a Surgery Partners employee and Ben Patterson, then CEO of PMC.

46.     As a result, Ms. Duval was among those tasked to review all 2018 surgical cases for potential rebill opportunities.

47.     In August 2019 Ms. Duval was promoted to Interim Chief Nursing Officer.

48.     The then PMC CEO, Carter Ilgenfritz, informed her that her salary would be increased from $106,000 to $130,000 plus reimbursement for tuition for a RN to MSN program.

49.     The job duties of the Chief Nursing Officer position were created together by PMC and SP in 2002 and updated in 2017. They job duties were printed on Surgery Partners letterhead, and were part of the Surgery Partners official Policies and Practices manual.

50.     As CNO, Ms. Duval regularly worked for, and alongside, SP employees. For example, a Surgery Partners, Inc. employee, Donna Giles, President of Clinical Operations of Surgery Partners, flew to PMC of Houma to provide Ms. Duval several days of in person training for her orientation, and then continued remotely to train and supervise her during the remainder of her orientation. Once Ms. Giles confirmed that Ms. Duval had satisfied all aspects of the training program, she certified that Ms. Duval was complete. Ms. Duval also received mentorship and had monthly conference calls with Patricia Hannon, Chief Clinical Officer of Surgery Partners, Inc. from 2020 until she went out on medical leave.

51.     To improve her professional capacity, she obtained a coding and billing certificate and clinical documentation specialist apprenticeship. She used that training to implement a clinical documentation improvement program at PMC of Houma.

52.     As a result of that documentation improvement program, Ms. Duval discovered more serious billing problems in 2019.

53.     She discovered that PMC of Houma was underbilling insurance for some services, and improperly categorizing services performed for others.

54.     For example, she learned that PMC of Houma was not coding or billing implant codes on spine implants, hip and shoulder implants, hernia meshes, etc.

55.     In some cases, PMC of Houma was failing to bill at all for surgical procedures performed or implants used.

56.     This *underbilling* of insurers resulted in the hospital *overbilling* Medicare.

57.     That is because Medicare makes up the cost difference for some services (also known as "coordination of benefits").

58.     So, when PMC of Houma improperly underbilled private insurers, that caused PMC of Houma to overbill Medicare.  That overbilling took the form of billing for unnecessary services, billing for services not provided, duplicate claims, and undercoding inpatient claims which resulted in improper Cost Outlier Payments.

59.     Additionally, Ms. Duval discovered that in some cases, the use of old templates was resulting in billing insurers, Medicaid and Medicare for drugs that were not actually used on patients.

60.     Concerned, in during the spring and summer of 2019, Ms. Duval reported this to the Board of PMC which includes several surgery partners employees, and Paula Poore, Surgery Partners employee who was at that time also serving as business office manager of PMC and who also worked on site at PMC for most of 2019.

61.     The billing discrepancies that Ms. Duval identified precipitated a 2020 lawsuit brought by a group of minority shareholder doctors of Surgery Partners against Surgery Partners. That case was *Schwab et al. v. Surgery Partners, Inc., et al.*, 32nd JDC Case No. 188889.

**B.     Ms. Duval's report of overbilling was met with retaliation.**

62.     In response to Ms. Duval's reports, the then PMC and SP leadership began removing her access to billing information at times.

63.     Not only did this prevent her from assessing additional billing problems violations, but it also prevented her from performing many of her basic job duties.

64.     Then, in 2020, it got worse.

65.     In April 2020, Ms. Duval received a competing job offer for $150,000. Ms. Duval asked Mr. Ilgenfritz to match that offer, which he informed her he and the Board agreed to do. Despite this, Ms. Duval's salary was not increased.

66.     In July of that year, Andrew Knizely was hired as PMC's interim CEO.

67.     Knizely had decision making authority at PMC over PMC employees' hiring, firing, assignment of job duties, leave approval, and controlled their conditions of employment including scheduling and the ability to work remotely among other conditions. Knizely also was responsible for maintaining employment records regarding Ms. Duval including her leave requests, evaluations, and other supervisory functions.

68.     For example, in the spring of 2020 as cases of COVID-19 necessitated changes in the work place, Knizely allowed employees, including Ms. Duval, to work remotely intermittently.

69.     Knizely reported to Scott Chapman, Regional VP of Surgery for Surgery Partners, Inc. Chapman often weighed in on the decisions regarding the hiring and firing of all staff at PMC (even temporary and agency positions for low level nurses), rates of pay, for all staff leave requests, evaluations of PMC staff, assignment of job duties, and conditions of employment including the ability to work remotely. Chapman also controlled the creation and funding of new positions at PMC of Houma and approved all pay increases recommended by Knizely.

70.     In July 2020, Ms. Duval still did not have the promised salary increase or tuition reimbursement, so she requested an increased salary, and requested tuition reimbursement, to Knizely. This request was not only to fulfil the promise made by PMC when she accepted the position, but also because an increase was necessary to match that received by male CNOs at hospitals managed by SP.

71.     The same month, Carter Ilgenfritz brought the issue to the PMC Board the same month, and Chapman, a PMC Board Member, Brad Owens and Doug Shirley, other SP employee sand PMC Board Members, and the physician board members reviewed the request but did not

make a determination.  Mr. Ilgenfritz was fired the next day and Knizely was hired as the Interim CEO.

72.     Shortly after Knizely became interim CEO and once he learned of Ms. Duval's role in uncovering and reporting the billing problems, he told her that SP has a target on her back and that SP wanted him to get rid of her.  He even told a physician owner the same thing.  Shortly after this, Knizely began retaliating against her.

73.     He then used a variety of measures to undermine Ms. Duval's authority and ostracize her from her coworkers and subordinates.

74.     Mr. Knizely told several physicians, and other employees working at the hospital, that Ms. Duval was the Interim Chief Nursing Officer because she had sexual relations with doctors.

75.     Mr. Knizely's subordinates Jeanne Olivier and Brittney Sonnier, both PMC employees, participated in sharing these false statements to PMC personnel.

76.     Beginning around April 2021, Mr. Knizely informed Ms. Duval's subordinates that they should not follow her instructions.

77.     According to an affidavit provided by Anna Plaisance, PMC's Director of Inpatient Services and Case Manager, Mr. Knizely said that "Megan is not a CNO, she never has been" and that her "work is only 70% correct."[1]

78.     According to an audio recording, Mr. Knizely told a staff member "Megan is not CNO."

79.     Knizely told Plaisance that men had "fallen victim" to Ms. Duval's appearance.

---

[1] Plaisance Affidavit at ¶ 4. Attached here and incorporated herein as **Exhibit A**.

80.     Knizely told Plaisance that Ms. Duval had made sexual approaches towards him in the past.[2]

81.     Mr. Knizely told Ms. Plaisance that "Surgery Partners does not want [Ms. Duval] at PMC."

82.     He told Plaisance that Ms. Duval was going to work for the minority shareholder doctors, where she could "get all the attention all day and flirt with all the doctors all the time, it will be perfect for her."[3]

83.     Later in the Spring of 2021, Mr. Knizely informed Ms. Plaisance that although Ms. Duval was Ms. Plaisance's direct supervisor, "any authority she has is fake."[4]

84.     On multiple occasions, Mr. Knizely falsely informed Ms. Plaisance, among others, that Ms. Duval was engaging in sexual relationships with male employees in the summer of 2021.

85.     At the same time, Ms. Olivier also perpetuated these false rumors, and told other PMC employees, including, Lesley Sanchez, PMC Business Office Clerk, and Shayla Washington, Clinical Ward Tech, that Ms. Duval was having sexual relationships with staff.  Another employee, including Karen Fairchild, PMC PR/GI LPN, repeated the rumor, although it is unknown at this time who told her the rumor.

86.     For example, on June 29, 2021, Ms. Olivier texted Ms. Plaisance and said Knizely "wouldn't tell just yet who actually told him factual evidence of her sleeping with multiple docs but it's enough to nail her just on that." See below:

SMS Message received from Jeanne Olivier (+19856886661) 6/29/2021 6:22:16 PM Message ID 8203

**JO**  He wouldn't tell just yet who actually told him factual evidence of her sleeping with multiple docs but it's enough to nail her just on that.

---

[2] *Id*. at ¶ 4(b).
[3] *Id*. at ¶ 5(a).
[4] *Id*. at ¶ 5(b).

87.     According to Ms. Plaisance, Mr. Knizely said that "it was addressed with board members in a meeting that an alleged sexual relationship with a physician board member was being used by Megan Duval as blackmail to manipulate decisions to her benefit."[5]

88.     The impact of these comments was soon apparent. Ms. Duval noticed her direct reports were difficult to lead, and this undermined her ability to perform her job duties.

89.     Throughout 2021, Mr. Knizely obstructed Ms. Duval at every turn, refusing to answer texts, emails and calls over months so that she could not make final decisions requiring his approval.

90.     This was part of an explicit, admitted effort to get rid of Ms. Duval.

91.     Ms. Olivier texted Ms. Plaisance that Ms. Duval "will basically not be asked to return. Andrew [Knizely] also said he isn't allowing her in the building. . . . Legal in not so many words have everyone stay calm till all the paperwork is finalized with the agreement and THEY ARE BOTH GONE!"

MMS Message received from Jeanne Olivier (+19856886661) 6/29/2021 7:24:04 PM Message ID 3714

> JO    Ok you made me cry.... Feel special because that doesn't happen often!! lol Thank you! I appreciate that more than you know! You are spot on with the " letter" it so bad I don't think anything else they have or can do would even matter. Legal is involved heavily. The plan is after the 2 week vacation, mind you this is our I interim CNO, choosing to go on a 2 week vacation while critical team members are out speaks volumes as well. She will basically not be asked to return. Andrew also said he isn't allowing her in the building. For one hates what they did to me because of our inappropriate relationship ( LoL) but he hate a BULLY and will not stand for it. Legal in not so many words have everyone stay calm till all the paperwork is finalized with the agreement and THEY ARE BOTH GONE!

SMS Message received from Jeanne Olivier (+19856886661) 6/29/2021 7:26:58 PM Message ID 8205

> JO    Basically one of the reason for the unanimous vote last night was the fact that her relationships with certain physicians would cause this law suit and this hospital to fail.

92.     Ms. Olivier explicitly tied the effort to get rid of Ms. Duval to Ms. Duval's role in discovering the billing discrepancies that led to the shareholder lawsuit. She wrote that "Basically one of the reason [sic] for the unanimous vote last night was the fact that [Ms. Duval's] relationships with certain physicians would cause this law suit and this hospital to fail."

---

[5] Plaisance, Complaint, February 11, 2022. Attached here and incorporated herein as **Exhibit B.**

93.     Ms. Plaisance swore that based on her observations, she concluded that "Andrew and Surgery Partners are trying to get rid of Megan Duval at any cost due to her discovery of billing issues that led to the lawsuit filed by the doctors."[6]

94.     This was corroborated by text messages directing her to keep the plan a secret. For example, in the context of a conversation about Ms. Duval, Ms. Olivier texted Ms. Plaisance: "So

SMS Message received from Jeanne Olivier (+19856886661) 6/9/2021 5:26:46 PM Message ID 6963

**JO**  So I will call you when I get in my car. You have to promise on your children and husband not to say a word. NOT A WORD. I got what is the actual plan.

I will call you when I get in my car. You have to promise on your children and husband not to say a word. NOT A WORD. I got what is the actual plan."

95.     On June 10, 2021, Ms. Olivier texted Ms. Plaisance that Mr. Knizely "must have had enough of Megan [because he] came get me and said let's go eat so we can talk about her":

SMS Message received from Jeanne Olivier (+19856886661) 6/10/2021 5:53:15 PM Message ID 7077

**JO**  He must have had enough of Megan becixe she came get me and said let's go eat so we can talk about her

96.     Later that day, Ms. Olivier texted Ms. Plaisance that "Im fixing to really rock [Ms. Duval's] world" and the "Gloves are off now:"



SMS Message received from Jeanne Olivier (+19856886661) 6/10/2021 8:56:19 PM Message ID 7095

**JO**  Did Andrew call you?

SMS Message received from Jeanne Olivier (+19856886661) 6/10/2021 9:41:31 PM Message ID 7099

**JO**  He is fixing to call me shortly!! I'll talk to you tomorrow!! Im fixing to really rock her world and get on the phone with Cenac

SMS Message received from Jeanne Olivier (+19856886661) 6/10/2021 9:42:39 PM Message ID 7100

**JO**  Gloves are off now

---

[6] Plaisance Aff. at ¶ 12.

97.     According to other staff members, Mr. Knizely told them that he purposefully does not answer Ms. Duval's communications because he likes to "fuck with" her.

98.     Ms. Plaisance similarly said that Mr. Knizely told her he "found it funny to mess with Megan by not responding to her, going around her to speak with her direct reports, and not including her in decisions regarding staffing."[7]

99.     Other employees also complained about Mr. Knizely's inappropriate treatment of Ms. Duval.

100.    On June 22, 2021, Kallie Deroche, the Perioperative Director at PMC, filed a complaint about Mr. Knizely and Ms. Olivier's conduct.[8]

101.    She specifically reported a "hostile work environment" directed towards Ms. Duval.[9]

102.    Ms. Deroche reported that she heard from an employee that Ms. Olivier "frequently states things offensive against Megan and myself such as: 'Megan slept her way to the top', 'they are out to get me, but I'm not scared cause Andrew has my back 100%.'"[10]

103.    Ms. Deroche also reported that an employee said they were "instructed by Jeanne to hide a coding book in her desk.  This employee later discovered that purpose of hiding this book was so that Megan could not complete a RAC audit."[11]

104.    Mr. Knizely responded to Ms. Deroche's complaint by *reiterating* allegation that Ms. Duval "is sleeping with doctors."[12]

---

[7] Plaisance Affidavit at ¶ 5(c)
[8] June 22, 2021 Email from Kallie Deroche to Scott Chapman *et al*., attached here and incorporated herein as **Exhibit C**; Plaisance Aff. at ¶ 5(d), (e)
[9] June 22, 2021 Email from Kallie Deroche to Scott Chapman et al.
[10] *Id*.
[11] *Id*.
[12] Plaisance Aff. at ¶ 5(d), (e).

105.     Jeanne Olivier also used gendered slurs towards Ms. Duval. On May 20, 2021, she described her as a "CUNT" to Anna Plaisance:



SMS Message received from Jeanne Olivier (+19856886661) 5/20/2021 7:39:55 AM Message ID 5973

I know! Heidi is asking Brittany for them and I told her to text Megan who said " i am reviewing them" then I told Brittany she needs to tell Andrew because at the end of the day Brittany is the one it reflects poorly on. I am so OVER HER. Andrew made me email her yesterday on purpose to get a response and that CUNT just answered me back since 5 yesterday.... if she only knew the value that response hold at this point in the game! She needs to stop fucking with everybody's.

106.     On June 3, 2021, Ms. Olivier described Ms. Duval as a "bitch" to Ms. Plaisance via text message:

I know that bitch didn't just try to micromanage me......I don't work for you, go fetch them yourself. I cried in Tara's office this morning. I have just had enough Anna between her and the misfits I have to manage I'm done. Tara DOESNT let me quit

107.     On June 15, 2021, Ms. Olivier called Ms. Duval a "cunt" again:

SMS Message received from Jeanne Olivier (+19856886661) 6/15/2021 12:55:06 PM Message ID 7293

I just need to get away from here. Did the cunt even show to work?

108.     On July 7, 2021, Ms. Olivier called Ms. Duval a "CUNT" again:



SMS Message received from Jeanne Olivier (+19856886661) 7/7/2021 8:16:22 AM Message ID 8425

Check your email when you have a minute. This CUNT!! I thought she didn't know anything about the funding company for the Liechty case.....

109.     On July 19, 2021, Ms. Olivier called Ms. Duval a "CUNT" again:

SMS Message received from Jeanne Olivier (+19856886661) 7/19/2021 10:25:58 AM Message ID 879

I'm so over those CUNTS..... yes I said CUNTS

110.     On November 16, 2021, Ms. Olivier called Ms. Duval a "cunt" again:

SMS Message received from Jeanne Olivier (+19856886661) 11/16/2021 1:30:36 PM Message ID 12235

I have never wanted to physically harm someone more in my entire life

SMS Message received from Jeanne Olivier (+19856886661) 11/16/2021 1:31:54 PM Message ID 12237

Is the cunt here right now?

111.    Ms. Olivier's antipathy and abuse towards Ms. Duval was explicitly linked to the discoveries about overbilling through outlier payments.

112.    For example, in a June 12, 2021 text exchange, Ms. Olivier discussed the outlier payments and then said Ms. Duval "is EVIL!"

SMS Message received from Jeanne Olivier (+19856886661) 6/12/2021 11:30:41 AM Message ID 7166

JO  $45,087..... The only thing that looks off is partners may not have sent all the invoices but for the most part the billed charges were not significantly high enough to each a bigger outlier payments. Yes she is!

SMS Message received from Jeanne Olivier (+19856886661) 6/12/2021 11:30:50 AM Message ID 7167

JO  It's so unfair to us all

SMS Message received from Jeanne Olivier (+19856886661) 6/12/2021 11:32:46 AM Message ID 7169

JO  She is EVIL!

113.    According to Ms. Plaisance, in July 2021 Mr. Knizely told her that he caused Ms. Duval to take leave.

114.    He explained that "He wanted her out of the hospital. He stated that he wanted to separate Megan from Kallie so she would hopefully come to her senses. If he could get Kallie from under Megan's control long enough she would turn against Megan."[13]

115.    The antipathy and "mandatory extended vacation" was explicitly tied to Ms. Duval's role in discovering billing discrepancies that led to the lawsuit.

116.    For example, on May 5, 2021, Ms. Olivier specifically linked the problems with Ms. Duval to the "stupid law suit":

MMS Message received from Jeanne Olivier (+19856886661) 5/5/2021 1:30:00 PM Message ID 2707

JO  YES!! Unreal! Not sure why I am surprised! She does this shit all the time when it's convenient for her and it's not FAIR. As for Cathy, not only did Theresa leave her a message the day of the direct admit I reminded Cathy via screenshot of Theresa's not. Cathy claims Megan told her she was going to do it before she left which is at 4 everyday! Sounds like Megan dropped the ball again and thankfully we rallied on this one and saved out asses even though once again it's HER. I'm so over walking on eggshells!! Andrew called me yesterday and Monday to vent about her. He has about had it and is trying to settle this stupid law suit so we can all move on and get shit rolling. She don't know what to do with herself right now. I'll have to fill you in more about what he text Brett about her Monday!! ANNA, IT WILL MAKE YOUR day! I'm so over HER!

---

[13] *Id*. at ¶ 5(f).

117.    For example, on June 16, 2021, Ms. Olivier sent a series of text messages to Ms. Plaisance that linked Megan's "mandatory extended vacation" and a HR "write up" to discussions with attorneys and texting with Schwab:

JO | SMS Message received from Jeanne Olivier (+19856886661) 6/16/2021 1:16:57 PM Message ID 7379
Well I was left out of the group text from Jessica on the new time to begin with. Then Andrew had me talking to attorneys so I was excused from that shit anyway.
Megan is fixing to be asked to take a mandatory extended vacation for the time being in order to get threw the next few weeks. Andrew is fixing to set Kallie straight too. If she still keeps being loyal to Megan, Kallie will be let go too.

JO | SMS Message received from Jeanne Olivier (+19856886661) 6/16/2021 1:38:56 PM Message ID 7385
It's pretty much said if she doesn't take this extended vacation the facility will lose important key players and families will be affected. In other words is just to keep the facility running without chaos for the time being but it's not changing the fact she is still being let go. He has already started write up from her behavior with HR.

JO | SMS Message received from Jeanne Olivier (+19856886661) 6/16/2021 1:39:34 PM Message ID 7386
Gee completely agreed with him

JO | SMS Message received from Jeanne Olivier (+19856886661) 6/16/2021 1:40:06 PM Message ID 7387
She should not be touching the organization chart at all.

JO | SMS Message received from Jeanne Olivier (+19856886661) 6/16/2021 1:40:40 PM Message ID 7388
You need to text Schwab. She was not told to mess with anything. This is why she needs to go now.

118.    Around July 2021, Mr. Knizely offered to promote Anna Plaisance to CNO to replace Ms. Duval.[14]

119.    At the same time, Mr. Knizely "began asking [Plaisance] for documentation of complaints regarding Megan," and specifically asked for "written complaints regarding altered medical records including forged signatures."[15]

120.    Ms. Plaisance concluded that Mr. Knizely was "was offering a promotional opportunity or an opportunity to advance my career if I filed these unwarranted complaints (complaints that were not true)."[16]

121.    According to Ms. Plaisance, Mr. Knizely said that "'corporate' had instructed him to call me and get an answer soon."[17]

---

[14] *Id.* at ¶ 6.
[15] *Id.* at ¶ 7.
[16] *Id.* at ¶ 7(b).
[17] Plaisance, Formal Complaint, Feb 10, 2022

122.    Also in July 2021, PMC fired Ms. Sanchez, who just weeks earlier, had complained that Mr. Knizely was spreading false rumors that Ms. Duval was sleeping with other employees.

123.    In September 2021, Mr. Knizely continued to harass and ostracize Ms. Duval, and referred to Ms. Duval as "histrionic" and similar to a "siren," to PMC physician Dr. David Rau.

124.    Also in 2021, Ms. Duval again requested the promised salary increase and tuition reimbursement to Knizely. Knizely brought Ms. Duval's request for an increased salary and tuition reimbursement to Campman. Ms. Duval was asking for a salary to match those of her male CNO peers at other SP managed hospitals. Campman agreed to an increase to $130,000 but informed Knizely the tuition reimbursement request would need to go to the PMC Board. Neither man brought the issue before the Board, and Ms. Duval never received a salary increase or tuition reimbursement.

**C.    Ms. Duval's health deteriorated, and she was removed from her position as Interim Chief Nursing Officer while on FMLA leave. The sex-based retaliation continued.**

125.    In late 2021 Ms. Duval developed symptoms later diagnosed as part of "long haul" COVID-19 symptoms. (She had contracted COVID-19 in 2020 while working in the hospital as a front-line medical provider.)

126.    As a result of these symptoms, on November 26, 2021, Ms. Duval was admitted into the ICU at Terrebonne General Medical Center with severe and life-threatening heart conditions: pericardial tamponade, heart failure, and respiratory failure.

127.    On November 29, 2021, Ms. Duval's husband informed Mr. Knizely that Ms. Duval was recovering at home and would be out for several weeks.

128.     On December 1, 2021, Tara Pellegrin, of PMC Human Resources informed Ms. Duval that her paid time off would be applied in her absence, and that Mr. Knizely approved the remainder of needed time off as FMLA leave.  Ms. Pellegrin also sent her information to apply for disability benefits.

129.     Ms. Duval applied for short term disability benefits.

130.     On December 30, 2021, Ms. Duval was diagnosed with COVID-19 for a second time. Throughout January and February 2022, Ms. Duval received treatment from specialists for pulmonary and cardiothoracic issues.

131.     On January 13, 2022, Ms. Duval informed Mr. Knizely that she was able to return to work if her job description, but asked as a reasonable accommodation that her job description be modified to exclude patient care tasks.

132.     This should have been an easy accommodation to grant, because as Interim Chief Nursing Officer, Ms. Duval's day-to-day tasks were entirely focused on administration, compliance, and personnel management. She had not performed any patient care responsibilities since she began serving in that role.

133.     Further, Ms. Duval requested an accommodation of being allowed to work remotely as she finished her recovery.

134.     Mr. Knizely never responded to Ms. Duval's requests for accommodations.

135.     On January 21, 2022, while Ms. Duval was still on FMLA leave, Knizely, Chapman, and Sandra Vincent, a Surgery Partners, Inc. employee in the SP Human Resources Department, terminated her from her position as Interim Chief Nursing Officer.

136.     Chapman and Vincent were the ones to verbally inform Ms. Duval that she was removed the position.

137.    On the same call, Vincent and Chapman told her that she would continue to have a position at PMC with the same salary. Vincent and Chapman told Ms. Duval to reach out to them, not Knizely, if she had questions moving forward, and promised to provide a job description to her.

138.    An audio recording confirms that this removal from her position was a coordinated effort: several of Defendants' employees can be heard discussing it. An employee, Brittney Sonnier, says that Ms. Olivier **"wants Megan to believe that we are the reason why Megan got fired. No. It's all of us."**

139.    Another audio recording confirms that the point of the retaliation was to get Megan to quit.

140.    In the audio recording, Anna Plaisance says: "I am complicit, we are complicit in this, like, planned, like, conspiracy to fuck with her, to push her over the edge so that she quits."

141.    Another employee agrees, saying "mm hmm."

142.    In another audio recording, Brittany Sonnier is heard to say that Jeanne Olivier "set [Megan] up."

143.    Together, Knizely and Chapman and Patricia Hannan hired a consultant to replace Ms. Duval as Chief Nursing Officer at PMC. That individual was not disabled, had not taken FMLA leave, or reported any billing discrepancies.

144.    But Ms. Duval was not told what her official job title, job description, or job duties would be.

145.    Human Resources encouraged Ms. Duval to get "clearance" from her physician to return to work, but did not provide an updated Department of Labor's FMLA Certificate listing her new job duties, or even an informal list of job duties to bring to her physician.

146.    As a result, Ms. Duval could not get clearance that she was physically fit for her job – because no one had told her what her job was.

147.    On January 25, 2022, Mr. Knizely informed Ms. Plaisance that he would not promote her to CNO because she lacked "courage."

148.    She took this to refer to her refusal to make false complaints against Ms. Duval as he had requested in June 2021.[18]

149.    He told her that if she "would have just written up a complaint it would be done by now and Megan would be gone. He stated that now he has to go a route that he did not want to and I am probably going to hurt people that I care about more than it is going to hurt Megan."[19]

150.    He further elaborated that Ms. Plaisance "had small children and I should maybe be CNO when my children are older."[20]

151.    Ms. Plaisance interpreted these statements "as a threat."[21]

152.    Finally, Mr. Knizely told Ms. Plaisance he expected her to participate in a medical record audit in the coming weeks. He "implied that the audit would be biased in order to frame Megan for Medicare fraud."[22]

153.    Ms. Plaisance also swore that Mr. Knizely's subordinates "have said repeatedly that [Knizely] and they are trying to get rid of Megan and that [Knizely] will protect them."[23]

154.    On January 24, 2022, PMC began to advertise the Chief Nursing Officer position online.[24]

155.    Ms. Duval was not invited to apply.

---

[18] Plaisance Aff. at ¶ 8.
[19] Id.
[20] Id.
[21] Id. at ¶ 9.
[22] Id. at ¶ 13.
[23] Id. at ¶ 10.
[24] See, e.g., Surgery Partners internal posting, on Linkedin, Jobsearcher, and Indeed.

156.     Sometime in early 2022, Mr. Knizely continued his campaign of harassment against Ms. Duval by telling PMC physician Dr. Guy Zeringue that Ms. Duval was have a sexual relationship with PMC Board Member, Dr. Brett Casey.

157.     Dr. Zeringue complained to PMC leadership about this, but PMC did not take any responsive action.

**D.     Ms. Duval reported the retaliation. Defendants conducted an "internal investigation" that resulted in no discipline for any employee – except a reprimand against Ms. Duval herself.**

158.     On February 11, 2022, Ms. Duval sent an email to Defendants' leadership expressing concern that: (1) the Company had removed her from the Chief Nursing Officer Position while she was on FMLA and in retaliation for uncovering and reporting billing irregularities; and (2) that Andrew Knizely and Jeanne Olivier created a hostile work environment by spreading rumors that Ms. Duval "slept your way" to the CNO role.

159.     On February 18, 2022, Ms. Duval's attorneys wrote a letter to Physicians Medical Center, L.L.C. and Surgery Partners, Inc. detailing the factual situation and raising issues of legal violations including of the False Claims Act, Title VII, the Equal Pay Act, Americans with Disability Act, the Rehabilitation Act, the Employment Retirement Income Security Act, the Louisiana Employment Discrimination Law, the Louisiana Human Rights Act, and the Family Medical Leave Act.

160.     On February 21, 2022, counsel for SP Management Services, Inc. responded to Ms. Duval's letter and stated that she was "representing Ms. Duval's employer (which is actually SP Management Services)."

161.     Defendants told Ms. Duval that they were conducting an investigation into the complaints.

162.    On March 3, 2022, Defendants told Ms. Duval that her new job would be Clinical Program Director and shared her job description with her for the first time. The job duties of the Clinical Program Director position were created together by PMC and SP in 2022, printed on Surgery Partners letterhead, and were part of the Surgery Partners official Policies and Practices manual.

163.    This job does not appear on PMC's organizational chart. (A partial organizational chart for PMC of Houma is as follows, from before Ms. Duval was promoted to Interim Chief Nursing Officer.)



164.     On April 18, 2022, Ms. Duval filed a Charge of Discrimination with the EEOC against Physicians Medical Center, L.L.C. and Surgery Partners, Inc..

165.     On April 25, 2022, she received a Right to Sue letter.

166.     On May 10, 2022, Defendants closed their investigation.

167.     The email closing the investigation made clear that Defendants had <u>only</u> investigated two discrete issues: allegations regarding Ms. Duval's removal as Chief Nursing Officer, and the rumors that Ms. Duval "slept [her] way" to the CNO role.

168.     Defendants did not take any steps to investigate any of the other issues Ms. Duval and her attorneys had raised, including legal violations of the False Claims Act, the Equal Pay Act, the Americans with Disability Act, the Rehabilitation Act, the Employment Retirement Income Security Act, and the Family Medical Leave Act.

169.     In an email of May 13, 2022, Ms. Plaisance reported that from the questions asked during the investigation, "**it was clear that Surgery Partners was now retaliating against Megan again**, for it turned the investigation of Andrew and Jeanne into an investigation into her." (Emphasis added.)

170.     The investigation concluded.

171.     Instead of taking any remedial action against Knizely or the others, SP's Chief Compliance Officer reprimanded <u>Ms. Duval</u> because she allegedly "behaved inappropriately towards [her] coworkers."

172.     The Chief Compliance Officer told Ms. Duval that her behavior was "not appropriate."

173.    Finally, on June 23, 2022, Sandra Vincent sent Ms. Duval an email informing her that she was being fired for "insubordination", despite the fact that Ms. Duval was on long-term disability.  The reason for termination is a pretext for the retaliation, harassment and discrimination being perpetuated by defendants.

174.    Because of all of the above, Ms. Duval now brings suit.

### IV.    Causes of Action

**Count One – Whistleblower Retaliation in violation of the False Claims Act**
**and Louisiana Law**
**(Corporate Defendants)**

175.    The False Claims Act provides remedies for employees who are "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against" as a result of "efforts to stop" False Claims Act violations.[25]

176.    To engage in protected activity under the Act, an employee need not "have filed a lawsuit or have developed a winning claim" at the time of the alleged retaliation. Instead, an employee's actions "must be aimed at matters that reasonably could lead to a viable claim under the Act."[26]

177.    In other words, the actions must "relate to 'matters demonstrating a 'distinct possibility' of False Claims Act litigation.'"[27]

178.    Similarly, Louisiana's Whistleblower Law (R.S. 23:967) protects employees against reprisal when they disclose any "workplace act or practice that is in violation of state law."

179.    Here, Ms. Duval reported to Defendants' management structure that the Defendants were violating state and federal law by overbilling payors, often Medicare. This in violation of La

---

[25] 31 U.S.C. §3730(h)(1).
[26] *United States ex rel. Byrd v. Acadia Healthcare Co*. (M.D. La. 2021), *citing United States ex rel. Wuestenhoefer v. Jefferson*, 105 F. Supp. 3d 641, 672 (N.D. Miss. 2015).
[27] *Id*.

R.S. 14:70.1, La. C.C. 1953 for engaging in fraud and a deceptive trade practice in violation of La.RS 51:1405(A)).

180.    That overbilling took the form of billing for unnecessary services, billing for services not provided, duplicate claims, and undercoding inpatient claims which resulted in improper Cost Outlier Payments.

181.    That reporting created the "distinct possibility" of False Claims Act litigation.

182.    In response, Mr. Knizely and others began a campaign of retaliation against Ms. Duval, and ultimately terminated her from her position as CNO

183.    Knizely also revoked PMC's promise to increase Ms. Duval's pay to $150,000 per year in retaliation.

184.    The connection between Ms. Duval's disclosure and the retaliatory conduct was obvious to observers: for example, Ms. Plaisance swore that based on her observations, she concluded that "Andrew and Surgery Partners are trying to get rid of Megan Duval at any cost due to her discovery of billing issues that led to the lawsuit filed by the doctors."[28]

185.    The retaliation against Ms. Duval was corroborated by a wider pattern of retaliation at PMC.

186.    According to Ms. Plaisance, "when an employee (Lesley Sanchez) filed a complaint against Jeanne and Andrew, Andrew then terminated that employee. After Lesley was terminated, Brittney Sonnier told me that Andrew made her file a complaint against Lesley because there was nothing in Lesley's file."[29]

---

[28] Plaisance Aff. at ¶ 12.
[29] Id. at ¶ 11.

187.    And the minority shareholders of PMC noted that PMC had been "retaliating against Members and Defendants' own staff, both medical and non-medical, who learned of and pointed out" problems.[30]

188.    Likewise, Earline Hutchison, who identified some of the billing problems, was fired on September 3, 2019.

189.    On August 28, 2019, Anita Becker wrote an email to Carter Ilgenfritz stating that "several staff members" had expressed "fear of reprisal," and specifically that the "recent audit of the business office is a direct result of Megan Duval calling to report us to Surgery Partners." On September 30, 2019, she was terminated.

190.    Similarly, in 2020, Guy Zeringue and Brett Casey reported that "whistleblowers" had been locked "out of the billing software when they uncovered gross errors on Surgical Partners part."

191.    Ms. Plaisance similarly swore that she is "in fear of retaliation by Andrew Knizely and Surgery Partners. . . . I am fearful that Andrew will discuss my complaint with these employees and they will retaliate against me making it impossible for me to continue a working relationship with these individuals which is essential in order for me to perform my job."[31]

192.    Ms. Deroche reported that she has a "fear of retaliation."[32]

193.    A third employee reported that she was "terrified of what Jeanne [Olivier] would do to her if she did speak up."[33]

---

[30] *Schwab, supra,* Petition at ¶ 17.
[31] *Id*. at ¶ 17.
[32] June 22, 2021 Email from Kallie Deroche to Scott Chapman *et al.*
[33] *Id*.

194.     And that third employee and a fourth expressed that they were "worried about retaliation and are afraid their current work environment will become worse following the report of these issues."[34]

195.     All this corroborates the retaliation that Ms. Duval experienced after she reported billing discrepancies that constituted violations of state and federal law.

196.     Defendants retaliated against Ms. Duval by subjecting her to a hostile work environment, failing to pay her equally to her male peers who did not engage in protected activity, refusing her tuition reimbursement, refusing to increase her salary, hyperscuitinzing her performance, removing her from her position, offering her only a demoted position, and imposing unwarranted discipline in response to her complaints.

197.     The adverse actions taken against Plaintiff were motivated by retaliatory animus.

**Count Two – Gender Discrimination and Retaliation Under Title VII, the Louisiana Employment Discrimination Law, the Louisiana Human Rights Act and Louisiana's Whistleblower Law (R.S. 23:967)
(Corporate Defendants)**

198.     Title VII of the Civil Rights Act bars gender discrimination in the form of workplace sexual harassment. Civil Rights Act of 1964, § 701 *et seq*., as amended, 42 U.S.C. § 2000e *et seq*.

199.     A hostile work environment resulting from sexual harassment is a kind of gender discrimination that violates Title VII. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66, 106 S. Ct. 2399, 2405, 91 L. Ed. 2d 49 (1986).

200.     A prima facie case of hostile work environment requires: (a) the employee belongs to a protected group, (b) the employee was subject to unwelcome sexual harassment, (c) the harassment was based on sex, (d) the harassment affected a "term, condition, or privilege of

---

[34] *Id.*

employment," and (e) *respondeat superior* (*i.e.*, the employer knew or should have known of the harassment and failed to take remedial action). *Jones v. Flagship Int'l*, 793 F.2d 714, 719–20 (5th Cir. 1986). Where the harasser is a supervisor, this last element can be eliminated. *Watts v. Kroger Co.,* 170 F.3d 505, 509 (5th Cir. 1999).

201.    For behavior to be harassment, the conduct must be unwelcome "in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive." EEOC Compl. Man. (CCH) P3114 (Mar. 19, 1990) (quoting *Henson v. City of Dundee*, 682 F.2d 897, 903 (11th Cir. 1982). Sometimes behavior from the plaintiff appears to welcome or encourage the harassment, when in fact that reciprocation of sexual behavior was coerced. *See Phillips v Smaelly Maintenance Serv., Inc.* 711 F.2d 1524 (11th Cir. 1983) (holding lower court correct to consider that the alleged harasser knew plaintiff needed job to make house payments and exploited her financial need to solicit sexual relations).

202.    Harassment affects a "term, condition, or privilege of employment" when it is "sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Royal v. CCC & R Tres Arboles, L.L.C.,* 736 F.3d 396, 401 (5th Cir. 2013), quoting *Harvill v. Westward Commc'ns, L.L.C.,* 433 F.3d 428, 434 (5th Cir. 2005) (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S. Ct. 2399, 91 L.Ed. 2d 49 (1986)). In *Lauderdale v. Texas Dep't of Criminal Justice, Institutional Div.*, the employee had a viable hostile work environment due to the "frequency of unwanted attention," where her harasser repeatedly called her, asked to "snuggle," and repeatedly asked to get coffee after work. *Lauderdale v. Texas Dep't of Criminal Justice, Institutional Div.,* 512 F.3d 157, 164 (5th Cir. 2007). The Fifth Circuit found that "[g]iven this pervasiveness, the level of severity necessary to establish an altered work environment is diminished." *Id*.

203.    An employer make take advantage of an affirmative defense against sexual harassment if it can show: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S. Ct. 2275, 2293, 141 L. Ed. 2d 662 (1998).

204.    No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment. *Id.* at 2279. This is *quid pro quo* harassment, and results in strict liability for the employer. *See* EEOC Enforcement Guidance, "Vicarious Employer Responsibility for Unlawful Harassment by Supervisors" (June 18, 1999).

205.    Title VII, specifically 42 U.S.C. § 2000e-3 makes it unlawful for an employer to retaliate against an employee who has opposed an unlawful employment practice, or a practice they reasonably believed to be unlawful.

206.    Many activities are considered "protected" under Title VII, including but not limited to reporting or opposing harassment.[35]

207.    La. R.S. 23:332(A)(1) makes it unlawful to discriminate against any individual in employment based on their sex, and applies similar standards to Title VII.

208.    Here, Mr. Knizely and his subordinates engaged in a series of acts of sexual harassment towards Ms. Duval, suggesting that she had had sexual relations with doctors,

---

[35] *Carter v. Town of Benton*, 827 F.Supp.2d 700 (W.D. La. 2010). It is worth noting that Title VII protects employees from retaliation if the employee reasonably believed that the practices were unlawful, whether or not they were, in fact, unlawful. *See, e.g., Williams v. Racetrac Petroleum, Inc*., 824 F.Supp.2d 723 (M.D. La. 2010). Thus, an employee can prevail in a retaliation claim even if there was no underlying illegal conduct; proof of an actual unlawful employment practice is not required to state a claim for unlawful retaliation. *Long v. Eastfield College*, 88 F.3d 300, 304 (5th Cir. 1996).

describing her as a "siren," and saying she "slept her way to the top."

209.    Mr. Knizely is Ms. Duval's supervisor.

210.    Ms. Duval opposed the harassment by reporting it and asking that it stop.

211.    When complaints were made about these acts of harassment, Mr. Knizely responded by _repeating_ the offensive statements rather than investigating and correcting them.

212.    Indeed, he has bragged about burying complaints and doing no investigation because "he is the CEO."

213.    Ms. Duval was demoted from her role as Interim CNO in retaliation in part for opposing the harassment.

214.    Defendants have not exercised reasonable care to prevent and correct promptly any sexually harassing behavior.

215.    Indeed, the only person punished as a result of their investigation was Ms. Duval, who received a written reprimand.

216.    Additionally, "increased scrutiny" can be a form of retaliation.[36]

217.    PMC staff members have been accessing Ms. Duval's email, increasing their scrutiny in response to her complaints.

218.    Ms. Plaisance reports that in the summer of 2021, Jeanne Olivier said that Robert Bland "had figured out how to get back in to Megans email."

219.    Ms. Plaisance indicated that Ms. Olivier had deleted some of Ms. Duval's sent and received emails.

220.    Then, on February 11, 2022, shortly after Ms. Plaisance emailed a formal complaint, Ms. Plaisance witnessed Robert Bland go into Ms. Duval's office and do something

---

[36] _Mahbod v. Jones_, 13-cv-5546 (E.D. La. May 19, 2014) (increased scrutiny of work after filing EEOC claim stated a claim for retaliation under Title VII).

with her computer.

221.    Defendants' behavior towards Ms. Duval was offensive, severe, unwelcome, and pervasive.

222.    The pervasiveness of the conduct created a hostile work environment that was severe enough to affect the terms, conditions, and privileges of employment.

223.    Defendants' actions have caused Ms. Duval to suffer mental, emotional and psychological harm.

224.    Ms. Duval suffered a loss of present and future wages, employment benefits, and future career opportunities as a result of Defendants' unlawful conduct.

225.    On April 18, 2022, Ms. Duval filed Charge of Discrimination No. 461-2022-01365.

226.    On April 25, 2022, Ms. Duval was issued a Right to Sue Letter.

227.    Further, Defendants have discriminated and retaliated against Ms. Duval for reporting gender discrimination that violated both federal and state law. Upon learning of her complaints of gender discrimination by subjecting her to a hostile work environment, failing to pay her equally to her male peers who did not engage in protected activity, refusing her tuition reimbursement, refusing to increase her salary, hyperscuitinzing her performance, removing her from her position, offering her only a demoted position, and imposing unwarranted discipline in response to her complaints.

228.    The adverse actions taken against Plaintiff were motivated by discriminatory and retaliatory animus.

229.    Defendant is liable for the acts and/or omissions of its agents and employees. Defendant, either directly, or by and through their agents, directly and proximately caused Plaintiff's severe injuries, damages, and losses.

**Count Three – Family Medical Leave Act - Interference and Retaliation**
**(Corporate Defendants and Andrew Knizely, Sandra Vincent and Scott Chapman)**

230.    Plaintiff was an eligible employee as defined by the Family Medical Leave Act ("FMLA") at all relevant times to this Complaint and was entitled to a total of 12 workweeks of leave during any 12-month period because of "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).

231.    Plaintiff was entitled to the protections of the FMLA as her employers had over fifty employees within 75 miles. *See* 29 U.S.C. § 2611(4).

232.    Defendants Knizely acted, directly or indirectly, in the interest of Corporate Defendants when interacting with Plaintiff and exercised independent control over her work situation.

233.    The FMLA makes it unlawful for "any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this title … [or] to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this title." 29 U.S.C. § 2615.

234.    Under the FMLA, an employee is generally entitled to be reinstated to the same position or an equivalent position after FMLA leave.[37]

235.    An equivalent position requires "equivalent employment benefits, pay, and other terms and conditions of employment."[38]

236.    Here, Ms. Duval was removed from her role as Chief Nursing Officer during her FMLA leave.

---

[37] 29 U.S.C. § 2614(a)(1).
[38] 29 U.S.C. § 2614(a)(1)(B).

237.    Her new job as Clinical Program Director is not equivalent to her role as Chief Nursing Officer.

238.    For example, the new role, unlike the prior one, requires "extensive mobility including walking, standing, stooping, bending, balancing, crouching, and sitting in supervising of clinical area."

239.    The new role, unlike the prior one, requires "[r]epeating frequent tasks such as lifting, carrying, pushing, pulling, handling, reaching, and twisting."

240.    The new role, unlike the prior one, does not allow any remote work.

241.    The new role, not shown on any organizational chart, was created solely to avoid an obviously retaliatory termination of Ms. Duval.

242.    For that reason, it lacks any of the advancement opportunities that Ms. Duval's prior role had.

243.    Not only have Defendants interfered with Ms. Duval's rights under the FMLA, but they have discriminated and retaliated against her for exercising her rights under the FMLA.[39] She has a strong case based on temporal proximity – she was a successful employee until she was terminated from her position while still on leave. In addition to removing her from her position, Defendants retaliated against her by subjecting her to a hostile work environment, hyperscuitinzing her performance, offering her only a demoted position as a replacement position, and imposing unwarranted discipline in response to her complaints.

244.    The adverse actions taken against Plaintiff were discriminatory, and in retaliation for engaging in protected activity and were motivated by retaliatory animus.

---

[39] 29 U.S.C. § 2615(a)(2).

245.    Defendant is liable for the acts and/or omissions of its agents and employees. Defendant, either directly, or by and through their agents, directly and proximately caused Plaintiff's severe injuries, damages, and losses.

**Count Four – Disability Discrimination and Retaliation in Violation of the Title I and Title V of the ADA, Rehabilitation Act, Louisiana Employment Discrimination Law, Louisiana Human Rights Act, and Louisiana's Whistleblower Law (R.S. 23:967) (Corporate Defendants)**

246.    When an employee requests an accommodation for a disability, the employer is required by law to engage in the interactive process of seeking accommodation.  Failure to engage in that process is itself an ADA violation.[40]

247.    Similar requirements apply under the Louisiana Human Rights Act and the federal Rehabilitation Act as well.

248.    A disability under the ADA is "an impairment that substantially limits one or more major life activities, a record of such an impairment, or being regarded as having a disability." 42 U.S.C. § 12102(1); 29 C.F.R. § 1630.2(g). An employee with a disability is entitled to reasonable accommodations that do not constitute an undue hardship on the employer. 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.9.

249.    At all pertinent times, Plaintiff performed the functions of her job competently and was more than qualified.

250.    An employer is obligated to engage in an interactive process with the employee that identifies the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations. 29 C.F.R. § 1630.2(o)(3). This interactive process is mandatory. *Stokes v. Nielsen*, 751 Fed. Appx. 451, 455 (5th Cir. Oct. 8, 2018).

---

[40] *Hacker v. Cain*, 16-cv-00842, R. Doc. 56 at 16 (M.D. La. Sept. 8, 2017) (failure to engage in interactive process can be independent ADA violation.)

251.    Corporate Defendants are recipients of federal funds.

252.    In November 2021, Ms. Duval was admitted into the ICU at Terrebonne General Medical Center with severe and life-threatening heart conditions: pericardial tamponade, heart failure, and respiratory failure.

253.    The on-going impacts of these conditions have substantially limited her major life activities.

254.    On January 13, 2022, Ms. Duval informed Mr. Knizely that she was able to return to work, but asked as a reasonable accommodation that her job description be modified to exclude patient care tasks.

255.    This should have been an easy accommodation to grant, because as Interim Chief Nursing Officer, Ms. Duval's day-to-day tasks were entirely focused on administration, compliance, and personnel management. She did not have any patient care responsibilities.

256.    Further, Ms. Duval requested an accommodation of being allowed to work remotely as she finished her recovery.

257.    Mr. Knizely did not respond.

258.    No representative of Defendants responded to the request for accommodation.

259.    No representative of Defendants took any steps to engage in an interactive process of seeking accommodation.

260.    In a letter of February 18, 2022, Ms. Duval's attorneys reminded Defendants of the request for accommodation, and noted that there had been no interactive process of seeking accommodation.

261.    No representative of Defendants ever provided a substantive response to that letter.

262.   No representative of Defendants took any steps to engage in an interactive process of seeking accommodation in response to the letter.

263.   On March 3, 2022, Ms. Duval was assigned to a new job as Clinical Program Director.

264.   The job description for that new job specified that she would might be "called upon to occasionally assist and/or provide care to patients" in a manner that requires "lifting, carrying, pushing, pulling, handling, reaching, and twisting."

265.   In assigning her that new job, no representative of Defendants acknowledged that Ms. Duval had made a request for accommodation of no patient care tasks.

266.   On March 3, 2022, Ms. Duval's representative reiterated the question about the accommodation of remote work during recovery.

267.   Defendants' representative's only response was "The position is not a remote position." However, several male employees were allowed to work remotely.

268.   At no point has any representative of Defendant engaged in an interactive process of seeking accommodation.

269.   At no point has any representative of Defendant even acknowledged the existence of Ms. Duval's request for accommodation, even though it was described in writing, by attorneys to attorneys.

270.   Further, Defendants have discriminated against Ms. Duval upon learning of her disabilities and have retaliated against Plaintiff for seeking accommodations and complaining about discrimination that violated both federal and state law, by subjecting her to a hostile work environment, hyperscuitinzing her performance, removing her from her position, offering her only a demoted position, and imposing unwarranted discipline in response to her complaints.

271.    The adverse actions taken against Plaintiff were discriminatory, and in retaliation for engaging in protected activity, and were motivated by her disability status, and retaliatory animus.

272.    Defendant is liable for the acts and/or omissions of its agents and employees. Defendant, either directly, or by and through their agents, directly and proximately caused Plaintiff's severe injuries, damages, and losses.

### Count Five – Equal Pay Act of 1963, 29 USC § 206 et al, Discrimination and Retaliation (Corporate Defendants)

273.    The Equal Pay Act prohibits discrimination in compensation on the basis of sex.[41]

274.    Here, when Ms. Duval took the Chief Nursing Officer job, she was told that her salary would be increased from $106,000 to $130,000 plus reimbursement for tuition for a Bachelor of Science.

275.    Then, in 2020, Ms. Duval received a job offer at a competing surgical center, Bayou Regions, offering $150,000 per year.

276.    PMC's CEO (the predecessor to Knizely) promised to match that salary.

277.    Despite both promises, Ms. Duval's pay was not increased.

278.    And she received no response when she tried to begin the process of seeking reimbursement for enrollment in a Bachelor of Science program.

279.    As a result, Ms. Duval has been paid substantially less than male Chief Nursing Officers at other SP locations.

280.    Plaintiff performed job duties which were substantially equal to that of her male counterparts. She was paid less than comparable male administrator peers at PMC like Robert Bland (PMC's facilities director); Stanton Tait (PMC's VP of Revenue Cycle), and Andrew

---

[41] 29 U.S.C. § 206(d)(1).

Knizely (PMC's part-time CEO). Plaintiff performed work with the same skill and efforts, as her male counterparts, under the similar working conditions.

281.    Some of her administrator peers, like Robert Bland, receive extra "on call" pay.

282.    Ms. Duval does not, even though Ms. Duval was expected to be on call.

283.    The difference in pay between Ms. Duval and her male peers is her gender.

284.    Plaintiff engaged in protected activity when she filed a Charge of Discrimination for violations of the EPA with the EEOC.

285.    Defendants then retaliated against Ms. Duval in response subjecting her to a hostile work environment, hyperscuitinzing her performance, removing her from her position, offering her only a demoted position, and imposing unwarranted discipline in response to her complaints.

286.    The adverse actions taken against Plaintiff were discriminatory, and in retaliation for engaging in protected activity, and were motivated by her disability status, and retaliatory animus.

287.    Defendant is liable for the acts and/or omissions of its agents and employees. Defendant, either directly, or by and through their agents, directly and proximately caused Plaintiff's severe injuries, damages, and losses

288.    These violations of the EPA were willful, and show a reckless disregard for Plaintiff's protected rights under the EPA.

### Count Six- ERISA
### Section 510 of The Employee Retirement Income Security Act, 29 U.S.C. § 1140
### *(Against Corporate Defendants)*

289.    Plaintiff sought treatment for disabilities and injuries under employee group health insurance and sought and received short term and long-term disability through a policy provided by her employer.

290.     ERISA protects individuals for being retaliated against for exercising their rights under the act, including the right to participate in group health insurance and disability benefits.

291.     Defendants subjected Plaintiff to a hostile work environment, hyperscruitinized her work, removed her from her position, provided her a new demoted position, and investigated and imposed unwarranted discipline on Plaintiff, in retaliation for exercising her rights under ERISA and to prevent attainment of benefits to which she would have become entitled under an employee benefit plans.

292.     Defendant was motivated by discriminatory and retaliatory intent.

293.     As a result of Defendant's unlawful actions, Plaintiff suffered damages.

294.     Corporate Defendants are liable for the acts and/or omissions of its agents and employees.

295.     Defendants, either directly, or by and through its agents, which directly and proximately caused her severe injuries, damages and losses.

### Count Seven – Intentional Infliction of Emotional Distress
### (Knizely, Sonnier, Pellegrin, Vincent, Chapman and Olivier)

296.     Plaintiff realleges and incorporate each and every foregoing paragraph.

297.     Intentional infliction of emotional distress is (a) intentional or reckless conduct (b) which was extreme and outrageous; and (c) caused severe emotional distress to the plaintiff.

298.     Defendants Knizely, Sonnier, Pellegrin, Vincent, Chapman and Olivier's conduct described above was intentional.

299.     It was extreme and outrageous.

300.     And Ms. Duval suffered severe emotional distress as a result of Defendants' behavior described above.

### Count Eight – Breach of Implied Covenant of Good Faith and Fair Dealing

**(Corporate Defendants)**

301.     There is an implied covenant of good faith and fair dealing in every contract in Louisiana. *See Bonanza International, Inc. v. Restaurant Management Consultants, Inc*., 625 F. Supp. 1431, 1445 (E.D. La. 1986); *Grisaffi v. Dillard Dep't Stores, Inc.,* 43 F.3d 982, 983 (5th Cir. 1995); *Brill v. Catfish Shaks of America, Inc.,* 727 F.Supp. 1035, 1039 (E.D. La. 1989).

302.     Defendants' acts described above violate that implied covenant of good faith and fair dealing.

**Count Nine – State Law Direct Action Claim**
**(Against XYZ Insurers 1-10)**

303.     Defendants XYZ Insurers 1-10, upon information and belief, have issued and/or currently have in effect one or more policies of insurance covering one or more of the Defendants named herein. For valuable consideration received, these policies obligated XYZ Insurers 1-10, jointly and/or severally, to pay on behalf of their insured Defendant(s) any sums the insured Defendant(s) may become obligated to pay to Plaintiff or to indemnify their insured Defendant(s) for any sums the insured Defendant(s) may become obligated to pay to Plaintiff.

304.     By reason of their illegal and unconstitutional acts, Defendants are liable to Plaintiff for all damages and injuries they have suffered as a result. Upon information and belief, XYZ Insurers 1-10 are contractually obligated to pay these sums on behalf of the insured Defendant(s).

305.     Upon information and belief, XYZ Insurers 1-10 are liable to Plaintiff for any and all damages incurred by reason of the insured Defendant(s)' acts, up to their policy limits, notwithstanding the fact that the insured Defendant(s) may themselves be able to assert claims of privilege or immunity from liability.

306.     Under Louisiana Revised Statute § 22:655(B), Plaintiff brings a direct action against XYZ Insurers 1-10 to recover any and all sums they are obligated to pay Plaintiffs on

behalf of their insureds or to indemnify their insureds.

## I.   RELIEF REQUESTED

307.   Wherefore Plaintiff prays for judgment against Defendants as follows:

(a)   For a judgment against Defendants for all asserted causes of action;

(b)   For a judgment awarding compensatory and special damages;

(c)   For judgment awarding front pay;

(d)   For judgment awarding back-pay;[42]

(e)   For judgment awarding double back-pay under the False Claims Act.[43]

(f)   For a judgment awarding Plaintiff her costs and attorney's fees;

(g)   Punitive Damages;

(h)   For a judgment awarding pre- and post-judgment interest at the highest rates allowed by law; and

(i)   For all other and further relief as may be necessary and appropriate.

308.   Plaintiff states any and all other causes of action that may become known through a trial of this matter on its merits against any and all other parties which are herein named or which may be added later, and request any and all other damages or remedies which this Court may seem equitable.

309.   Plaintiff reserves the right to notice of defect to this pleading and reserve the right to amend or supplement this Petition after discovery of any additional fact, law, or claim, the amendment of which to be performed by the filing of any subsequent pleading.

## **JURY DEMAND**

Plaintiff respectfully requests a trial by jury on all issues so triable.

---

[42] R.S. 23:967(C)(2).
[43] 31 U.S.C. §3730(h)(2).

Respectfully Submitted:

**AMO TRIAL LAWYERS, L.L.C.**


s/ David W. Ardoin_____
**DAVID W. ARDOIN, (L.B.N. 24282)**
**PRESTON L. HAYES (L.B.N. 29898)**
213-B East Bayou Road
Thibodaux, Louisiana 70301
Telephone: (985) 446-3333
Facsimile:  (985) 446-3300
david@amotriallawyers.com



**ST. MARTIN & BOURQUE**


s/ Charles C. Bourque, Jr._____
**Charles C. Bourque, Jr.** (LA Bar #20118)
315 Barrow Street
Houma, Louisiana 70360
Email:  cbourque@stmblaw.com
Telephone:  985-876-3891